JUDGE PAULEY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LANDESBANK BADEN-WÜRTTEMBERG, <br><br> Plaintiff, <br><br> v. <br><br> GOLDMAN, SACHS & CO. and TCW ASSET MANAGEMENT COMPANY, <br><br> Defendants. | Civil Action No.: _____ <br><br> **COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Landesbank Baden-Württemberg ("LBBW"), on behalf of its wholly-owned subsidiary LBBW Luxemburg S.A. ("LBBW Luxemburg"), by and through its attorneys, for its complaint against Defendants, alleges as follows:

### OVERVIEW

1.     This action seeks recovery of at least $37 million of losses incurred by Plaintiff as a result of fraud, negligence, and other wrongful conduct by Goldman, Sachs & Co. ("Goldman") and TCW Asset Management Company ("TCW") in connection with their structuring, marketing, management, and sale to LBBW Luxemburg of certain notes of a collateralized debt obligation ("CDO") known as Davis Square Funding VI ("Davis Square VI").

2.     CDOs are structured asset-backed securities whose value and payments are derived from an underlying collateral portfolio of bonds, loans, or similar assets. The CDO issues notes that are purchased by investors and the cash flow from the collateral is used to repay the CDO's obligations to its investors. Thus, an investment in a CDO is a purchase of a right to participate in the future cash flows from the CDO's underlying collateral portfolio.

3.      Defendant Goldman was Davis Square VI's "Structuring and Placement Agent." Defendant TCW was Davis Square VI's "Investment Advisor." Goldman and TCW selected Davis Square VI's collateral portfolio, a portion of which was purchased from affiliates of Goldman, and all of which was "warehoused" by an affiliate of Goldman prior to its transfer into the CDO's collateral portfolio. As Investment Advisor, TCW managed Davis Square VI's collateral portfolio and was tasked with reinvesting and substituting the collateral securities to maintain the credit quality of the CDO's collateral portfolio for the benefit of its investors. Goldman and TCW marketed Davis Square VI to LBBW Luxemburg and other investors. Goldman, through its warehouse affiliate, retained veto power over every collateral security chosen for Davis Square VI's portfolio.

4.      When the Davis Square VI transaction closed on March 30, 2006, Davis Square VI's collateral portfolio was comprised of approximately 95% residential mortgage-backed securities ("RMBS"). RMBS are structured asset-backed securities that are backed by thousands of individual residential mortgage loans. Of the RMBS in Davis Square VI, approximately 33% were backed by so-called "subprime" mortgage loans, approximately 46% were backed by so-called "midprime" mortgage loans, and approximately 16% were backed by so-called "prime" mortgage loans.

5.      On March 30, 2006, Goldman sold to LBBW Luxemburg two Davis Square VI notes (the "Notes"), each due in 2041: (1) a Class A-1LT-b note in the amount of $30 million, which was rated AAA by Standard & Poor's ("S&P") and Aaa by Moody's Investors Service, Inc. ("Moody's"), and which paid interest at an annual rate of 4.989%; and (2) a Class A-2 note in the amount of $7 million, which also was rated AAA by S&P and Aaa by Moody's, and which

paid interest at an annual rate of 5.169%. Currently, the Notes have "junk" ratings: "CC" from S&P and "C" from Moody's.

6.      On March 30, 2006, 30-day U.S. Treasury bills, which are generally considered risk free, and are therefore rated triple-A, paid 4.67% annual interest, and 30-day commercial paper from highly-rated corporations, also rated triple-A, paid approximately 4.72% annual interest. Defendants marketed the Notes to LBBW Luxemburg by representing that they were safe, secure, and nearly risk free. Defendants emphasized the Notes' triple-A ratings, effectively comparing their risks to those of U.S. Treasury bills or highly-rated corporate debt. Goldman and TCW also touted their respective experience as placement agent for previous Davis Square CDOs (I through V) and as investment advisor for numerous other CDOs. Specifically, Goldman and TCW touted the "excellent history of asset upgrades versus downgrades" of the Davis Square CDOs, and the fact that as of March 2006 each of these CDOs remained in compliance with its over-collateralization and interest-coverage tests.

7.      In Davis Square VI's marketing materials, which included an investor presentation "flip book" and Offering Circular that LBBW Luxemburg reviewed and relied upon, Goldman and TCW marketed Davis Square VI as a $2 billion "High Grade Structured Product CDO." Defendants touted the Notes' triple-A ratings and represented that the "Strengths of the Transaction" lay in Davis Square VI's collateral portfolio of investment grade RMBS.

8.      When the Notes were sold to LBBW Luxemburg, at least 22%, or $440,250,000, of Davis Square VI's collateral was RMBS backed by mortgage loans originated by affiliates of Countrywide Financial Corporation ("Countrywide"); 6%, or $128,228,000, was RMBS backed by mortgage loans originated by affiliates of New Century Financial Corporation ("New Century"); and 4%, or $80,012,000, was RMBS backed by mortgage loans originated by

3

affiliates of Fremont General Corporation ("Fremont"). The majority of these RMBS were backed by mortgage loans issued by these lenders during 2005.

9.      By March 2006, Goldman had formed close relationships with Countrywide, New Century, Fremont, and other subprime lenders by funding their lending activities and by purchasing, in bulk, billions of dollars of "whole loans" that Goldman bundled together and marketed as its proprietary brand of RMBS.  A "whole loan" is a mortgage loan sold in the secondary market to a buyer that assumes the entire loan along with its rights and obligations.  A whole loan is differentiated from investments, such as RMBS, in which the buyer becomes part owner of a pool of mortgages.  In Davis Square VI, 6%, or $118,833,000, of the collateral was RMBS underwritten by Goldman itself and backed by whole loans purchased directly from Countrywide, New Century, Fremont and other mortgage lenders.

10.      As part of the process of purchasing billions of dollars of subprime mortgage loans, Goldman hired outside analytics firms to evaluate the characteristics of those loans. Goldman also employed an in-house team that independently verified the value of the loans. Goldman's due diligence, along with Goldman's close relationships with these subprime lenders afforded Goldman special knowledge of the characteristics and quality of the mortgage loans Countrywide, New Century, and Fremont issued in 2005.  This special knowledge was not available to LBBW Luxemburg.

11.      Specifically, during 2005 there was a significant increase in early payment defaults ("EPDs"), "kickouts," and repurchase claims in the pools of loans Goldman bought from Countrywide, New Century, and Fremont.  Although there is no standard definition, an EPD is generally defined as a payment default within 60 to 90 days after the issuance of the loan. Mortgage loans are generally sold subject to the warranty that they will not suffer an EPD, which

is considered an incurable defect.  Kickouts occur when a loan purchaser, such as Goldman, conducts due diligence and refuses to purchase certain loans because of defects such as EPDs. Upon the occurrence of an EPD or other incurable defect, loan purchase agreements generally give the purchaser the right to require the originator to repurchase the loan.  Goldman observed these occurrences in the pools of mortgages it was purchasing, but concealed them from LBBW Luxemburg.

12.     According to minutes of firm-wide meetings held at Goldman in early March 2006, Goldman's senior-most executive leadership was observing the "accelerating meltdown for subprime lenders such as Fremont and New Century."  Goldman's executives privately observed that it was "Game Over" for such lenders.  As a result, by March 2006, Goldman's mortgage business was already "closing down every subprime exposure possible."  And by early March 2006, Goldman's avowed strategy was to "'put-back inventory,' where applicable, or liquidate positions."  By the end of that same month, however, Goldman and TCW had filled Davis Square VI with subprime RMBS originated by those very same subprime lenders and sold the Notes to Plaintiff with the representation that they were investments worthy of the highest possible ratings for safety and likelihood of repayment.

13.     By March 2006, therefore, Goldman knew at the highest levels of its organization that its representations to LBBW Luxemburg that the Notes merited triple-A ratings and were "High Grade" were blatantly false.  Accordingly, Goldman committed fraud and/or was negligent in marketing and selling the Notes to LBBW Luxemburg.

14.     For its part, TCW represented to LBBW Luxemburg in its marketing materials that its ability to act as collateral manager was another "strength" of Davis Square VI.  TCW touted that it was the "largest investment advisor in the structured product CDO market."  TCW

represented that it had "undertaken its own investigation" in selecting the collateral. TCW stated that its "security selection process" consisted of "rigorous analyses" of the underwriting practices of the originators and issuers of the RMBS it had selected for Davis Square VI. TCW claimed that it undertook "ongoing surveillance" and "continuous monitoring" of the securities it had selected to collateralize the Notes.

15.     TCW claimed that its selection of Davis Square VI's collateral had been informed by "[d]irect contact with Originators, Servicers, Bankers, Investors, and other market participants." TCW claimed that its "risk management process involve[d] thorough credit underwriting before selecting a security for purchase and active surveillance after purchase." Taking TCW at its word, by March 2006, TCW knew, or at the very least recklessly disregarded, the same rising EPDs, kickouts, repurchase claims, and other trends that Goldman was observing. As a result, TCW committed fraud and/or was negligent in marketing the Notes to LBBW Luxemburg.

16.     Goldman's malfeasance is further illustrated by its having entered into billions of dollars of contracts called credit default swaps ("CDS") with American International Group ("AIG"). In effect, Goldman was betting that Davis Square VI and similar CDOs would fail. Even more telling, Goldman used Société Générale S.A. ("SocGen") as a conduit so it could purchase even more "insurance" specifically against Davis Square VI's failure. SocGen is TCW's parent. Following AIG's collapse, Goldman received over $14 billion from its CDS contracts against the performance of the very same CDOs it underwrote and sold to investors such as LBBW Luxemburg, and received an additional, undisclosed, amount through its negative bets against Davis Square VI through SocGen.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332.  This action is between a citizen of Germany, as Plaintiff, and citizens of New York and California, as Defendants, and the amount in controversy exceeds $75,000.

18.     Venue is proper in the Southern District of New York because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

19.     Plaintiff LBBW is an international commercial bank headquartered in Stuttgart, Germany.  As of December 31, 2009, LBBW had balance sheet assets of €412 billion and nearly 13,000 employees worldwide.  LBBW brings this lawsuit on behalf of its wholly-owned subsidiary LBBW Luxemburg.  LBBW Luxemburg is a bank headquartered in Luxembourg with approximately 200 employees and balance sheet assets of approximately €11 billion.  LBBW Luxemburg was formerly known as LRI Landesbank Rheinland-Pfalz International S.A.  LBBW Luxemburg has authorized this lawsuit and assigned, to LBBW, any and all claims of LBBW Luxemburg arising out of this lawsuit.

20.     Defendant Goldman is the principal United States broker-dealer of The Goldman Sachs Group, Inc., a global investment banking, securities and investment management firm headquartered in New York City with its principal offices at 200 West Street, 29th Floor, New York, New York 10282.

21.     Defendant TCW is a California corporation with its principal offices at 865 South Figueroa Street, Suite 1800, Los Angeles, California 90017.  TCW is the collateral manager for Davis Square VI.  TCW is a subsidiary of SocGen.  As of March 30, 2010, TCW managed or had managed nearly $44 billion across 76 CDOs since 1996, including almost $26 billion in assets across 33 issuances of mortgage-backed securities and asset-backed securities-CDOs.

7

## OTHER RELEVANT PARTIES

22.     SocGen served as the "CP [*i.e.*, commercial paper] Put Counterparty" for Davis Square VI.  Defendant SocGen operates in approximately 82 countries and has nearly 135,000 employees.  SocGen opened its first office in the United States in 1938, and, according to SocGen's website, is "one of the largest foreign banking organizations in the United States with approximately 2,900 professionals working in 13 U.S. cities."

23.     Société Générale Corporate & Investment Banking ("SGCIB") offers corporate banking and fixed income services and securities through its branch in New York, as well as other offices in the United States.  SGCIB also provides securities, investment banking and advisory services through SG Americas Securities, LLC ("SGAM"), also located in New York. SGAM provides, *inter alia*, asset management, brokerage, clearing and execution, custody and issuer services through its branch in New York, as well as through other offices located in the United States, including Los Angeles, California and Houston, Texas.  SocGen is the parent company of Defendant TCW.  SocGen purchased over $1.4 billion in CDS from AIG that paid SocGen when Davis Square VI's value declined precipitously.  An undisclosed amount of this payment was then passed on to Goldman.

## FACTUAL BACKGROUND

**I.      Goldman Performed Increasingly Careful Due Diligence On Billions Of Dollars Of Subprime Mortgage Loans That It Purchased During 2005 And 2006, And Therefore Knew That Large Numbers Of Those Loans Were Defective.**

24.     During 2005 and 2006, Goldman conducted due diligence on billions of dollars of subprime mortgage loans.  Goldman's due diligence gave it knowledge of increasing rates of EPDs and kickouts that were double those experienced by RMBS issued in previous years.

25.     Before acquiring loans in such bulk sales transactions, whole loan buyers such as Goldman are afforded the opportunity to conduct due diligence on the loan pool for problems,

such as elevated levels of EPDs.  If upon conducting due diligence the buyers identify such problems, sometimes called "exceptions," these loan buyers can refuse to buy certain loans from that particular pool.  Those rejected loans are so-called "kickouts."  Bulk buyers explain to originators the reasons why such loans are being rejected, such as deviations from the originator's stated underwriting standards, defective home appraisals, or missing documentation.

26.     By early 2006, Goldman was looking closely at EPDs in the loans it was purchasing.  According to a "Presentation to [Goldman's] Board of Directors" regarding Goldman's "Subprime Mortgage Business," dated March 26, 2007, Goldman became "more vigilant on EPD identification and workout" in the first and second quarters of 2006.  The presentation states that Goldman had created a "dedicated group" that performed "an independent price verification of the mortgage inventory."  This team was "highly specialized" and had "extensive experience in the valuation of mortgage related products."  The presentation also states that Goldman's "investment in this team over the last several years [had] led to a significant reduction in the mortgage related unverified cash inventory."

27.     Goldman's March 26, 2007 presentation further indicates that in the "1&2Q 2006," Goldman became "more vigilant on EPD [early payment default] identification and workout."  Goldman was able to monitor early payment defaults and other such metrics because of its unique position within the RMBS and CDO markets, as more fully described below.

28.     Goldman's enhanced due diligence is further confirmed by a former employee in the Secondary Marketing Department of New Century, from whom Goldman purchased billions of dollars of loans in 2005 and 2006.  According to this employee, whereas investors had previously sampled only 20 to 30% of the loans in a particular pool as part of their due diligence

reviews, this process changed in 2006 when most investors began to look at the appraisal documents in all loan files of a particular loan pool.

29.     Further, according to an article in the *Financial Times*, dated August 18, 2010, "the one bank . . . that did analyse CDOs based on mortgages from the bottom up was Goldman Sachs." Goldman "developed its own analytical techniques, and used a large 'computer farm' in New Jersey to spread the analysis over multiple machines, so keeping the time each run took tolerable."

30.     As a bulk loan purchaser and underwriter of numerous RMBS and CDOs, Goldman also received confidential due diligence reports from external analytics firms. One such due diligence firm was Clayton Holdings, Inc. ("Clayton Holdings"). According to *The New York Times*, Clayton Holdings is "the nation's largest provider of mortgage due diligence services to investment banks" and it "communicated daily with bankers putting together mortgage securities." Clayton Holdings' Annual Report, filed on Form 10-K on March 14, 2008, stated that "[d]uring 2007, 2006 and 2005, [Clayton Holdings] worked with each of the 10 largest non-agency MBS underwriters, as ranked by Inside MBS & ABS, which accounted for 70%, 73%, and 73% of total underwriting during those respective periods."

31.     Throughout 2006, Goldman was Clayton Holdings largest client. Documents produced by Clayton Holdings to the Financial Crisis Inquiry Commission ("FCIC"), and made public during its September 23, 2010 hearing, reveal that for each quarter of 2006, and for the 2006 year overall, Clayton Holdings reviewed far more loans for Goldman than any other investment bank. A prospectus filed by Clayton Holdings on March 23, 2006 confirms that Goldman was one of Clayton Holdings' largest 20 clients beginning in fiscal 2004. Clayton Holdings' founder, Stephen M. Lamando, is a former residential whole loan trader at Goldman.

32.     In June 2007, the New York Attorney General, Andrew Cuomo ("NYAG"), subpoenaed documents from Clayton Holdings related to its due diligence efforts on behalf of the investment banks that underwrote substantial amounts of RMBS.  On January 27, 2008, Clayton Holdings revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  According to *The New York Times*, Clayton Holdings told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending exceptions."

33.     In a March 17, 2008 article, the *Los Angeles Times* reported that employees of Clayton Holdings and similar firms, including eight former loan reviewers who were interviewed for the article, "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports."

34.     As Clayton Holdings' largest client, Goldman had the benefit of Clayton Holdings' due diligence reports.  As a result, Goldman knew by the first quarter of 2006 that underwriting standards had fallen sharply.  For example, documents provided by Clayton Holdings to the FCIC show that of the 16,993 loans that Clayton Holdings reviewed for Goldman in the first quarter of 2006, Clayton Holdings identified 3,705, or approximately 22%, as "Reject" because such loans did "not meet guidelines and have insufficient compensating factors."

11

35.     Clayton Holdings' reports to Goldman were confidential, and not shared with purchasers of MBS or CDOs underwritten by Goldman.  Vicki Beal, Senior Vice President of Clayton Holdings, testified before the FCIC on September 23, 2010 that "[s]uch reports are 'works for hire', the property of our clients and provided exclusively to our clients. . . .  To our knowledge, prospectuses do not refer to Clayton and its due diligence work."

36.     In his testimony before the FCIC, dated March 1, 2010, Gregory K. Palm, Goldman's Executive Vice President and General Counsel, confirmed that Goldman performed extensive due diligence on the individual loans in the pools backing the securities in its RMBS offerings:

> [Goldman] employed internal and third-party resources to conduct due diligence on the individual loans in the pools backing the securities in its RMBS offerings, including reviewing selected loan files, verifying compliance with state and federal lending statutes, and selective review of property appraisals against comparable values.  As a result of these reviews, Goldman Sachs did not accept loans that, based on its review and analysis, appeared to have potentially significant legal, regulatory compliance or other issues.  Knowing what we know today, of course, we wish that we had done even more.

37.     In a *New York Times* article, dated July 24, 2010, Gretchen Morgenson reported on several pending investigations by the Financial Industry Regulatory Authority ("FINRA") and stated that "according to two people briefed on the inquiries" the "large banks that provided money to mortgage originators during the mania hired outside analytics firms to conduct due diligence on the loans that Wall Street bought, bundled into securities and sold to investors." These analysts "looked for loans that failed to meet underwriting standards" and "would take their findings back to the Wall Street firms packaging the securities; the reports were not made available to investors."  The investigators have found that "in 2006-07, amid the mortgage craze, more loans didn't meet the criteria.  But instead of requiring lenders to replace these funky

12

mortgages with proper loans, Wall Street firms kept funneling the junk into securities and selling

them to investors . . . ."  The article describes how some firms used these so-called scratch-and-

dent loans to increase their profits in the securitization process:

> When due-diligence reports turned up large numbers of defective
> loans – known as exceptions – the banks used this information to
> negotiate a lower price on the mortgages they bought from the
> original lenders.  So, instead of paying 99 cents on the dollar for
> the problem loans, the firm would force the lender to accept 97
> cents or perhaps less.  But the firm would still sell the mortgage
> pool to investors at 102 cents or higher, as was typical on high-
> quality loan pools.

38.     According to the article, Wall Street firms were "hesitant to reject too many

dubious loans" because doing so might "slow the securitization machine" and "imperil their

relationships with lenders like New Century; as long as Wall Street's lucrative mortgage

factories were humming, it needed loans to stoke them.  Forcing New Century to eat its bad

loans might prompt it to take its business elsewhere."

## II.    Goldman Knew That Mortgage Loans And RMBS Issued By Countrywide, New Century, And Fremont During 2005 And 2006 Had Declined Dramatically In Safety, Security, And Likelihood of Repayment.

39.     Goldman directed much of its enhanced due diligence at subprime mortgage

originators such as Countrywide, New Century, and Fremont.  By 2006, Goldman had formed

close relationships with these lenders by purchasing from them billions of dollars of mortgage

loans and mortgage-backed securities and reselling them in the form of notes issued by CDOs.

In the process, Goldman obtained information not available to its CDO investors, including

LBBW Luxemburg.  By March 2006, Goldman knew that the subprime loans these lenders had

originated during 2005 and 2006 were the product of much worse underwriting standards than

loans issued in earlier years and were therefore much less likely to be repaid.  Nevertheless,

Goldman and TCW placed in Davis Square VI hundreds of millions of dollars of RMBS backed by defective mortgage loans issued by these unscrupulous lenders.

### A.   Countrywide Financial Corporation.

40.    When Goldman and TCW marketed Davis Square VI to LBBW Luxemburg in March 2006, it contained approximately $440 million of RMBS backed by mortgage loans originated by affiliates of Countrywide.  The vast majority of these RMBS have either been written down to junk or sold from the Davis Square VI portfolio at a severe discount.  Goldman provided warehouse financing for Countrywide to originate its mortgage loans.  Goldman purchased Countrywide's loans in bulk, analyzed the loans through firms such as Clayton Holdings, and served as underwriter of the resulting RMBS.  As a result, by March 2006, Goldman had special insight into the deteriorating quality of Countrywide mortgage loans and Countrywide's increasingly lax underwriting standards.

41.    Former Countrywide employees have admitted that Countrywide originated loans that did not meet its underwriting criteria because Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrowers were able to repay the loans.  Instead of evaluating a borrower's ability to repay the loan, Countrywide's Sales Training Facilitator Guide instructed originators to "look for ways to make the loan rather than turn it down."  According to a former Countrywide manager, "[i]f you had a pulse, [Countrywide] gave you a loan."

42.    Countrywide's loan originators systematically manipulated the income, assets, and employment status of borrowers to qualify them for mortgages they could not afford. Countrywide loan officers would "coach" borrowers as to what level of inflated income they should state to qualify for a loan they could not otherwise afford.  Countrywide also inflated borrowers' stated incomes, or facilitated income inflation, by encouraging ineligible borrowers

to resort to "stated income loans." According to a former Countrywide account manager, the company was "infested" with employees that ignored company underwriting standards requiring them to determine if borrowers could repay their loans.

43. Former Countrywide employees have revealed that as many as 80% of the loans originated by a Countrywide office in Florida – a state from which many of the loans in the Notes originated – did not meet loan underwriting guidelines. According to another former Countrywide employee, approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes, and one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications so that borrowers could qualify for loans they could not afford.

44. Moreover, even in the few cases when Countrywide employees actually obtained income documentation (*i.e.*, a Form W-2) demonstrating that the borrower did not qualify for a loan, the documentation was ignored by Countrywide and the loan was re-submitted as a stated income loan with an inflated income figure so as to facilitate approval of the loan.

45. Countrywide's deliberate actions of ignoring its own loan underwriting guidelines and routinely inflating borrowers' incomes resulted in the company being charged with fraud by numerous state Attorneys General. Ultimately, Countrywide settled the charges by paying a huge sum – $8.4 billion.

46. According to documents produced by Clayton Holdings to the FCIC, throughout 2006, Clayton Holdings rejected a much greater percentage of Countrywide loans than average for failing to meet underwriting guidelines. For example, in the first quarter of 2006, in its confidential due diligence reports to Goldman and other banks, Clayton Holdings rejected approximately 25% of Countrywide loans compared to only 15% of all residential mortgage

loans.  As a result, Banks such as Goldman that purchased loans directly from Countrywide knew, by March 2006, that Countrywide's loans and the resulting RMBS were particularly toxic.

47.     According to a lawsuit brought on June 4, 2009 by the Securities and Exchange Commission ("SEC"), in the first quarter of 2006, HSBC, a purchaser of Countrywide's 80/20 loans, began to contractually force Countrywide to "buy back" certain of these loans that HSBC contended were defective.  In response, on March 28, 2006, Countrywide's CEO, Angelo Mozilo sent an e-mail to Countrywide's executives, directing them to implement a series of corrective measures to "avoid the errors of both judgment and protocol that have led to the issues that we face today caused by the buybacks mandated by HSBC."  Mozilo further stated that the 100% loan-to-value (also known as 80/20) subprime product is "the most dangerous product in existence and there can be nothing more toxic . . . ."

48.     Goldman was familiar with the type of loans that Countrywide was originating during 2005 and 2006, and the poor quality of the resulting RMBS, because Goldman financed many of those loans and underwrote the resulting RMBS.  For example, in 2005, Goldman was the underwriter or co-underwriter for the following RMBS backed by Countrywide loans:

- Alternative Loan Trust 2005-22T1 (principal of $263,349,932);

- CHL Mortgage Pass-Through Trust 2005-16 (principal of $412,924,740);

- CHL Mortgage Pass-Through Trust 2005-18 (principal of $413,919,844);

- CHL Mortgage Pass-Through Trust 2005-24 (principal of $1,036,789,285);

- CHL Mortgage Pass-Through Trust 2005-31 (principal of $620,690,100); and

- Alternative Loan Trust 2005-81 (principal of $620,690,100).

49.    Further, in June 2006, Goldman completed underwriting a Countrywide mortgage securitization with HSBC, the bank that had begun forcing Countrywide to buy back nonconforming loans earlier in the first quarter of 2006.

50.    Numerous Countrywide RMBS in Davis Square VI's collateral portfolio have been downgraded to junk, including, among others, CWHL 2005 HYB5, CWHL 2005 HYB6, and two classes of CWHL 2005 HYB8.

51.    Thus, as a result of Goldman's position as a significant financer and purchaser of Countrywide loans, and underwriter of Countrywide RMBS, Goldman knew by March 2006 that Countrywide's 2005 and 2006 vintage loans, and the resulting RMBS, were severely impaired. Accordingly, Goldman knew that the Notes were similarly impaired.

**B.    New Century Financial Corporation.**

52.    When Goldman and TCW marketed Davis Square VI to LBBW Luxemburg in March 2006, it contained approximately $128 million of RMBS backed by mortgage loans originated in 2005 by New Century.

53.    The quality of New Century's loans deteriorated substantially in 2005 and 2006. For example, according to documents produced by Clayton Holdings to the FCIC, throughout 2006 Clayton Holdings, in its confidential due diligence reports to Goldman and other banks, rejected a much greater percentage of New Century loans than average for failing to meet underwriting guidelines.   And throughout 2005 and 2006, New Century's loans experienced escalating EPDs.  As a result, New Century was forced by Goldman and other banks to buy back

an increasing volume of its loans because those loans were in breach of the representations and warranties New Century made to buyers in securitization transactions.

54.     New Century declared bankruptcy on April 2, 2007.  According to an article in the *Sunday Times*, dated April 3, 2007, Goldman emerged as New Century's single largest creditor.

55.     The U.S. Bankruptcy Court for the District of Delaware presiding over the New Century case appointed an examiner (the "Examiner") to work with governmental agencies to investigate New Century's lending practices.  The Examiner engaged a law firm, forensic accountants, and financial advisors to aid in that investigation.  The Examiner provided a final report to the Bankruptcy Court on February 29, 2008 (the "New Century Bankruptcy Report").

56.     The New Century Bankruptcy Report concludes that New Century experienced serious deterioration in loan quality from 2005 through 2007.  For example, with respect to New Century loans originated in 2005, the Examiner found that EPDs increased steadily from 6.58% in April 2005 to 9.24% by December of 2005.  Similarly, "kickouts" from whole loan sales steadily increased from 5.64% in January of 2005 to 8.77% in December of 2005, which amounted to nearly $2.3 billion of loans.  Among the top reasons given for the kickouts were property values, documentation, compliance and excessive debt-to-income issues. Approximately $280 million of loans were kicked out "due to loan files that were missing required documentation – loans that never should have been funded until the files were complete."  As one of the largest buyers of New Century whole loans, and the recipient of analytical reports from Clayton Holdings, Goldman had first-hand knowledge of the deteriorating quality of New Century loans.

57.     From an already deteriorated loan quality condition in 2005, the Examiner found that "New Century's loan quality trends worsened dramatically in 2006 and early 2007." The Examiner observed that "[t]he most important metrics by which New Century tracked loan quality, EPDs and kickouts, showed large increases throughout [2006]." The Examiner concluded that "in March and September 2006, it became clear that loans originated by New Century in 2005 and early-2006 had significantly greater delinquency rates than similar loans originated by New Century in 2003 and 2004 and by other subprime lenders in 2006."

58.     By no later than the end of 2005, a build-up or back-log of unresolved repurchase claims had begun to develop at New Century.  As New Century's largest creditor, Goldman made many, if not the greatest single share, of repurchase claims against New Century.

59.     At least 16 of the 251 RMBS held by Davis Square VI were comprised of mortgage loans underwritten by New Century, with a principal balance of over $128 million. Numerous New Century RMBS in the Davis Square VI portfolio have been downgraded to junk, including NCHET 2005-B-M2, NCHET 2005-B-M3, NCHET 2005-B-M5, and NCHET 2005-B-M6.

## C.   **Fremont General Corporation.**

60.     When Goldman and TCW marketed Davis Square VI to LBBW Luxemburg in March 2006, it contained approximately $80 million of RMBS backed by mortgages originated by the subprime lender Fremont.

61.     According to a memorandum issued by the Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs (the "Subcommittee on Investigations"), "[i]n the first calendar quarter of 2007, Goldman Sachs helped Fremont securitize over $1 billion in high risk loans by creating GSAMP Trust 2007-FM1 and GSAMP Trust 2007." The memorandum states that "Moody's and S&P rated the Fremont

securities, even though analysts at both firms expressed concern about the quality of Fremont loans." It added that "Goldman Sachs sold the Fremont securities to investors, while at the same time purchasing $15 million in credit default swaps referencing some of the Fremont securities. A little over a year later, every tranche in the security was downgraded to junk status."

62.     Davis Square VI contained eleven RMBS comprised of mortgage loans issued by Fremont with a principal balance of over $88 million. The majority of these RMBS have been downgraded to junk or had their ratings withdrawn.

**D.     Goldman Sachs Mortgage Company.**

63.     Several of the RMBS in the Davis Square VI portfolio were issued by Goldman Sachs Mortgage Company ("GSMC"), a wholly owned subsidiary of Goldman. GSMC purchased the mortgage loans underlying these RMBS from various loan originators with whom it did regular business – such as New Century, Countrywide, and Fremont. Goldman Sachs hired analytics companies such as Clayton Holdings to analyze these mortgage loans for "exceptions" to determine their value. Goldman then bundled these loans into RMBS and sold them to CDOs such as Davis Square VI.

64.     For example, Davis Square VI included RMBS issued by a trust called GSAA 2005-HE5. According to the Prospectus Supplement filed on Form 424B5 with the SEC in connection with the issuance of these securities, approximately 40% of the loans backing GSAMP 2005-HE5 RMBS were loans that GSMC purchased from New Century, and another 21% of the loans were purchased from Fremont:

> Approximately 40.24% of mortgage loans in the trust were acquired by Goldman Sachs Mortgage Company ("GSMC"), an affiliate of the depositor, from NC Capital Corporation (the "NC CAPITAL MORTGAGE LOANS"). NC Capital Corporation previously acquired the mortgage loans from its affiliate, New Century Mortgage Corporation, who originated or acquired them. Approximately 21.73% of the mortgage loans in the trust were

> acquired from various original loan sellers under GSMC's mortgage conduit program (the "CONDUIT MORTGAGE LOANS"), approximately 21.38% of the mortgage loans in the trust were acquired from Fremont Investment & Loan (the "FREMONT MORTGAGE LOANS"), approximately 13.99% of the mortgage loans in the trust were acquired from United Pacific Mortgage d/b/a Mandalay Mortgage (the "MANDALAY MORTGAGE LOANS") and approximately 2.67% of the mortgage loans in the trust were acquired from Acoustic Home Loans, LLC (the "ACOUSTIC MORTGAGE LOANS").

65.     The total collateral backing the entire GSAMP 2005-HE5 deal totaled approximately $1,256,919,200. It is significant that approximately 60% of GSAMP 2005-HE5 consisted of loans issued by New Century and Fremont. This illustrates that Goldman was thoroughly experienced in reviewing, analyzing, and purchasing hundreds of millions of dollars of New Century and Fremont mortgage loans. At present, the GSAMP 2005-HE5 security in Davis Square VI has been downgraded to "junk" status by Moody's.

66.     Davis Square VI also included three RMBS issued by a trust created by GSMC called GSAA 2005-14 with a combined principal balance of $10,349,000. According to the Prospectus Supplement filed on Form 424B5 with the SEC in conjunction with the issuance of the GSAA 2005-14 securities, more than half of the loans backing the GSAA 2005-14 securities were "acquired by GSMC from various other mortgage loan sellers under the Goldman Mortgage Conduit Program":

> These mortgage loans have been divided into two groups: loan group I, consisting of 1,205 mortgage loans having an aggregate scheduled principal balance of approximately $205,576,626 as of the statistical calculation date and loan group II, consisting of 2,602 mortgage loans having an aggregate scheduled principal balance of approximately $751,055,073 as of the statistical calculation date. Approximately 7.31% and 30.40% of the group I mortgage loans and group II mortgage loans, respectively, were acquired by GSMC, an affiliate of the depositor, from GreenPoint (the "GREENPOINT MORTGAGE LOANS"), approximately 32.67% and 11.33% of the group I mortgage loans and group II

21

mortgage loans, respectively, were acquired by GSMC from SunTrust (the "SUNTRUST MORTGAGE LOANS"), approximately 60.02% and 44.34% of the group I mortgage loans and group II mortgage loans, respectively, were acquired by GSMC from various other mortgage loan sellers under the Goldman Sachs Mortgage Conduit Program (the "CONDUIT MORTGAGE LOANS") and approximately 0.00% and 13.93% of the group I mortgage loans and group II mortgage loans, respectively, were acquired by GSMC from two other mortgage loan sellers.

67.      The Prospectus Supplement does not reveal from which "other mortgage sellers" Goldman purchased the loans. Nevertheless, because Goldman underwrote GSAA 2005-14 from a pool of mortgage loans that it reviewed and selected, Goldman had the opportunity to review the performance of these mortgage loans with the help of firms such as Clayton Holdings. At present, all of the GSAA 2005-14 RMBS in Davis Square VI have been downgraded by Moody's and S&P to "junk."

68.      In 2007, TCW caused Davis Square VI to invest in even more RMBS issued by GSMC and backed by loans GSMC had purchased from Countrywide. For example, in or about January 2007, TCW caused Davis Square VI to purchase a security from the GSAA 2007-1 trust, called GSAA 2007-1 M6, with a principal balance of $3,000,000. According to the Form 424B5, filed by Goldman with the SEC in connection with the issuance of the GSAA 2007-1 securities, approximately 43% of the loans backing the GSAA 2007-1 securities were originated by Countrywide, approximately 50% of the loans were "acquired by GSMC from various other mortgage loan sellers under the Goldman Sachs Mortgage Conduit Program," and "approximately 6.48% of the mortgage loans were acquired by GSMC from the one (1) other [undisclosed] mortgage loan seller":

> Approximately 43.26% of the mortgage loans (the "Countrywide Mortgage Loans") were acquired by the sponsor, Goldman Sachs Mortgage Company ("GSMC"), an affiliate of the Depositor, from

Countrywide Home Loans, Inc. ("Countrywide Home Loans"), approximately 50.27% of the mortgage loans (the "Conduit Mortgage Loans") were acquired by GSMC from various other mortgage loan sellers under the Goldman Sachs Mortgage Conduit Program (the "Conduit Program") and approximately 6.48% of the mortgage loans were acquired by GSMC from the one (1) other mortgage loan seller.

69.     GSAA 2007-1 M6 was eventually downgraded by both Moody's and S&P to "junk" and was ultimately sold from the Davis Square VI portfolio on June 30, 2009 at a severe discount.

## III.  By March 2006, Goldman Was Observing the "Accelerating Meltdown for Subprime Lenders Such As Fremont and New Century" And Consequently Was "Closing Down Every Subprime Exposure Possible."

70.     As discussed above, by March 2006, Goldman had gained considerable experience in the RMBS market by, *inter alia*, purchasing billions of dollars of residential mortgage loans from subprime lenders such as Countrywide, New Century, and Fremont.  By early March 2006, Goldman had collected enough hard information to enable it to conclude, at the highest levels of its organization, that the inventory of subprime RMBS it had amassed was the product of poor lending standards and unworthy of triple-A ratings.

71.     Goldman's knowledge was revealed when, on April 27, 2010, the Subcommittee on Investigations held a hearing on "Wall Street and the Financial Crisis:  the Role of Investment Banks." The Subcommittee on Investigations released over 800 pages of internal documents produced by Goldman in connection with the Subcommittee's investigation.

72.     Goldman's internal documents reveal that by early 2006, prior to LBBW Luxemburg's purchase of the Notes, Goldman had begun privately telling subprime underwriters that a "subprime blow up MAY occur" or more likely a "fizzle out."  For example, a January 2006 "Presentation to:  Long Beach Mortgage" regarding "Plan for 2006," states:

What does the mortgage industry landscape look like in 2006?

\*      \*      \*

| | |
|---|---|
| ***The oft predicted, overly anticipated subprime blow up MAY occur*** | Actually, less likely to be a blowup and more likely to be a fizzle out. . . .  Some will win (eventually) and many will lose. |
| Housing prices soften | ***Eventually we will be right.***   Signs of cracking have surfaced<br>[Goldman] economists believe US housing prices are overvalued by 15%+ |

(Emphasis added.)

73.    By February 2006, Goldman was acting on its predictions that the subprime mortgage market would fail by reducing its exposure to mortgage loans.  The minutes of the February 28, 2006 meeting of Goldman's Firmwide Risk Committee[1] contain a presentation by Dan Sparks,[2] the head of Goldman's Mortgage Department, to a meeting co-chaired by David Viniar, Goldman's Chief Financial Officer, and Jerry Corrigan, a managing director at Goldman and former president and chief executive officer of the Federal Reserve Bank of New York.  The minutes state:

---

[1]  According to Goldman's Annual Report, filed on Form 10-K on January 27, 2009, "[t]he Firmwide Risk Committee reviews the activities of existing trading businesses, approves new businesses and products, approves firmwide market risk limits, reviews business unit market risk limits, approves market risk limits for selected sovereign markets and business units, approves sovereign credit risk limits and credit risk limits by ratings group, and reviews scenario analyses based on abnormal or 'catastrophic' market movements."

[2]  Dan Sparks ("Sparks") was, from 2006 until mid-2008, the head of Goldman's Mortgage Department.  According to Sparks, "[t]he business of Goldman's Mortgage Department involved structuring, underwriting, distributing, and trading mortgage and asset backed products, including loans, securities, and derivatives."  *See* Opening Statement of Daniel L. Sparks, Subcommittee on Investigations (Apr. 27, 2010).

Dan Sparks

- VaR up due to vols. ***Business working to reduce exposures***; a lot of shorts already covered.
- ABX widened 500bp on the week. Business covered $4BN in single names.
- ***Noted a lot of negative news in the subprime market with rumors on everyone.***
- CDS on CDOs started to widen significantly over the week.
- Business priced their largest CMBS deal last week. The deal was oversubscribed.
- Business priced an $11BN commercial mortgage loan yesterday. The deal was very well subscribed.
- ***Business continuing to clear out loans.***
- Noted there is some market concern in alt-a/prime space. However, nothing specific.

(Emphasis added.)

74.     One week later, at another meeting of the Firmwide Risk Committee, again co-chaired by David Viniar and Jerry Corrigan, Goldman had refined its strategy. The minutes of the March 7, 2006 meeting of Goldman's Firmwide Risk Committee include another presentation from Sparks. The presentation reveals that Goldman's Mortgage Department had concluded that "subprime lenders such as Fremont and New Century" – from whom Goldman had bought billions of dollars of loans to securitize and was subsequently marketing to unsuspecting investors such as LBBW Luxemburg in the form of CDOs such as Davis Square VI -- were experiencing an "accelerating meltdown." As a result, Goldman's mortgage business was currently "closing down every subprime exposure possible" and adopting a strategy to "put back" inventory where applicable or liquidate positions." The minutes state:

The March 7th Firmwide Risk Committee meeting commenced at 7:30am. The meeting was chaired by David Viniar and Jerry Corrigan. Apologies were received from Lloyd Blankfein and Bob Zoellick.

Divisional Reports

\*       \*       \*

Dan Sparks

1. ***"Game Over" – accelerating meltdown for subprime lenders such as Fremont and New Century.***

2. The Street is highly vulnerable, potentially large exposures at Merrill and Lehman. ***Current strategies are to "put back" inventory, where applicable, or liquidate positions.***

3. ***The Mortgage business is currently closing down every subprime exposure possible.***

4. Subprime woes are beginning to affect commercial real estate. The CMBX, which has been stable for years, jumped from 75bp to 200bp before settling back down to 150bp.

5. ***Hedge funds have been making money in this market, but it is difficult to tell how much others are losing because many CDO's with subprime assets are not [mark-to-market].***

(Emphasis added.)

75.     Thus, on March 7, 2006, Goldman's mortgage department was observing the "accelerating meltdown" of subprime lenders such as Fremont and New Century with whom it had close relationships. By March 2006, Goldman had seen that it was "Game Over" for these lenders. As a result, Goldman's mortgage department was, by March 2006, "closing down every subprime exposure possible." This involved transferring Goldman's exposure to other investors, such as LBBW Luxemburg. Goldman knew this was possible because, at the time, "it [was] difficult to tell how much others [were] losing because many CDO's with subprime assets [were] not [mark-to-market]."

76.     Goldman had a first-hand view of this "accelerating meltdown" because it had repeatedly provided the financing for these lenders' mortgage originations, purchased the mortgages in bulk, securitized the mortgages into RMBS, and re-securitized the resulting RMBS by creating CDOs.   Goldman's significant involvement, on all sides of RMBS and CDO transactions, provided it with special knowledge unavailable to LBBW Luxemburg.   LBBW Luxemburg relied on Goldman and TCW's assurances and the triple-A ratings affixed to Davis Square VI.   Given that the rating agencies had evaluated each of the over 230 RMBS underlying Davis Square VI, and provided their highest ratings to the CDO, LBBW Luxemburg relied on Goldman and TCW's representations that the required due diligence had been performed and that LBBW Luxemburg was investing in safe, nearly risk-free securities.

77.     Subsequent documents further demonstrate Goldman's view of the quality of the Notes sold to LBBW Luxemburg.   In an email, dated October 24, 2006, Goldman employee Geoffrey Williams states:

> Thinking we need to better leverage syndicates to move open risk from our bespoke trades given that most of them did not go through the initial syndication process; *guessing sales people view the syndicate "axe" email we have used in the past as a way to distribute junk that nobody was dumb enough to take first time around.*   We should have a distinct email that distinguishes our open risk that we have not broadly shown out versus cash transactions that did not clear.   Thoughts?

78.     In response, Goldman manager Jonathan Egol replied, "LDL," which presumably means, "Let's discuss live."   The email lists several CDOs, including Davis Square VII, for which TCW again acted as investment advisor and Goldman again acted as placement agent.

## IV.     Goldman And TCW Structured Davis Square VI To Obtain Misleading Triple-A Ratings.

79.     Defendants marketed Davis Square VI to LBBW Luxemburg by emphasizing the ratings awarded to the Notes by Moody's and S&P – the two leading debt rating companies.   The

Notes were rated AAA by S&P and Aaa by Moody's – the highest possible ratings for safety and ability to repay. Davis Square VI's sole asset was its underlying collateral portfolio. Davis Square VI's collateral portfolio consisted primarily of RMBS issued in 2005 that were rated AA and A. Representations concerning the quality of these underlying assets, particularly their credit ratings, were of the utmost importance to LBBW Luxemburg. Defendants knew these ratings were misleading and inflated. Defendants caused LBBW Luxemburg to rely on those false ratings in making its $37 million investment.

80. According to the Davis Square VI Offering Memorandum, it was a condition of the issuance of the Notes that "each be issued with a rating of 'Aaa' by Moody's and 'AAA' by S&P. . . ." These ratings are Moody's and S&P's highest ratings, indicating virtually zero risk of default as described below.

81. According to S&P, a AAA rating is defined as follows:

> An obligation rated 'AAA' has the highest rating assigned by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is extremely strong.

82. Further, S&P represents that its long-term issue (greater than one year) credit ratings are based on: (1) likelihood of payment – capacity and willingness of the obligor to meet its financial commitment on an obligation in accordance with the terms of the obligation; (2) nature of and provisions of the obligation; and (3) protection afforded by, and relative position of, the obligation in the event of bankruptcy." S&P further represents that "issue ratings are an assessment of default risk, but may incorporate an assessment of relative seniority or ultimate recovery in the event of a default." Finally, in explaining its rating methodology, S&P indicates that an "issue credit rating is a current opinion of the creditworthiness of an obligor with respect to a specific financial obligation, a specific class of financial obligations, or a specific financial

program. . . .   It takes into consideration the creditworthiness of guarantors, insurers, or other forms of credit enhancement on the obligation and takes into account the currency in which the obligation is denominated.  The opinion evaluates the obligor's capacity and willingness to meet its financial commitments as they come due, and may assess terms, such as collateral security and subordination, which could effect ultimate payment in the event of a default."

83.     According to Moody's, a Aaa rating is defined as follows:

> Moody's judges obligations rated Aaa to be the highest quality, with the "smallest degree of risk."

84.     Moody's ratings on long-term structured finance obligations primarily address the expected credit loss an investor might incur on or before the legal final maturity of such obligations *vis-à-vis* a defined promise.  As such, these ratings incorporate Moody's assessment of the default probability and loss severity of the obligations.   They also are calibrated to Moody's Global Scale.   Such obligations generally have an original maturity of one year or more, unless explicitly noted.   Moody's credit ratings address only the credit risks associated with the obligations; other non-credit risks have not been addressed, but may have a significant effect on the yield to investors.

85.     Davis Square VI was created through an iterative and interactive process involving Goldman, TCW, Moody's, and S&P.   Rather than simply creating Davis Square VI and asking Moody's and S&P to rate the Notes, Goldman and TCW communicated with Moody's and S&P throughout the process of structuring the CDO.   Goldman and TCW communicated with the rating agencies regarding what was needed to earn investment grade ratings for the Notes.   Specifically, in arranging and structuring a CDO such as Davis Square VI, investment banks such as Goldman routinely use rating agencies' publicly available models to pre-structure the deals.   Banks generally propose to the rating agencies certain collateral and

structures of seniority among the note classes to achieve the desired rating levels. In response, the rating agencies indicate whether the collateral and structures can achieve the requested ratings in accordance with their methodologies. The rating agencies inform the bank of the requirements for attaining its desired ratings and make recommendations for credit enhancements – such as purchasing additional collateral or buying additional bond insurance. This process requires the rating agencies to participate in the deal's structuring process. The process fails, however, if the banks are not truthful with the rating agencies regarding hidden deficiencies in the collateral. Although Goldman and TCW marketed the Notes with reference to their triple-A ratings, Goldman failed to disclose to S&P and Moody's information that the pools of mortgage loans underlying the collateral RMBS were in fact quickly deteriorating and suffering from escalating EPDs. Goldman knew, but failed to disclose, that the loan pools underlying many of the RMBS of Davis Square VI were experiencing EPD rates twice as high as those of RMBS issued only a few years earlier.

86.     The triple-A ratings were major considerations in LBBW Luxemburg's decision to invest in the Notes. These ratings indicated that the Notes were safe, stable, and nearly risk-free investments, analogous to U.S. Treasury bonds. Defendants represented – expressly and/or impliedly – that the Notes' ratings were accurate and were premised on the rating agencies having had access to all material information. In marketing the Notes based substantially on their S&P and Moody's ratings, Defendants were representing that those ratings were accurate and based on complete information.

87.     Defendants made affirmative representations and concealed risks related to Davis Square VI. LBBW Luxemburg did not have access to, and Goldman did not disclose, the true quality of the assets underlying Davis Square VI.

88.     The Davis Square VI Offering Memorandum explicitly required triple-A ratings, the highest ratings available, as a condition to the issuance of the Notes.  In making its investment decision to invest in Davis Square VI, LBBW Luxemburg reasonably and actually relied on Defendants' representations that the Notes were safe, secure, and thus deserving of triple-A ratings.  But for their triple-A ratings, LBBW Luxemburg would not have purchased the Notes.

## V.     TCW Misrepresented The Due Diligence It Performed On The Securities TCW Selected For Davis Square VI's Collateral Portfolio.

89.     According to Davis Square VI's marketing materials, TCW "seeks to focus on identifying weakening/problem credits more quickly than its competitors" and that its "objective is to avoid potential credit problems before they occur and maintain performance portfolios."  To accomplish this objective, TCW represented that it undertook a "security selection process" with respect to Davis Square VI that consisted of a "rigorous analysis."  TCW represented that this analysis included, *inter alia*:

- "Originator & Issuer" analysis, including underwriting, operation, business plan & franchise, and financial stability & liquidity;
- "Collateral Analysis," including analysis of pool stratification, historical pool performance and consistency, loan or pool level re-underwriting, and expected net loss and variance; and
- "Ongoing Surveillance" including an internal watchlist, monitoring collateral, and continuous monitoring of issuers and services.

90.     TCW stated that to analyze collateral, it employed numerous information systems such as Bloomberg, Yield Book, Intex, Trapp, Real Point, MRAC, Derivative Solutions, ABSNet, FactSet, CoStar, TCW Systems, and TCW Analytics.  With these systems' "Investment Decisions Inputs," TCW monitored certain characteristics of Davis Square VI's collateral such as "ABS Historic Issue Delinquency and Performance," and "ABS, MBS, and CMBS delinquencies."

91.     TCW represented that, with these systems in place, its practice was to "[r]eview all metrics available for the pool," and ask "[h]ow consistent is historical performance?" TCW claimed to "evaluate individual credits" and to undertake "thorough credit underwriting before selecting a security." TCW also claimed to have "Direct Contact with Originators, Servicers, Bankers, Investors, and other market participants." Such thorough due diligence, however, would have given TCW notice of the rising EPDs and other defects with the Davis Square VI collateral.

92.     The Davis Square VI Offering Circular, dated March 28, 2006, contains further representations concerning TCW's due diligence:

> The Collateral Assets expected to be purchased on the Closing Date have been selected by the Investment Advisor [*i.e.*, TCW] in accordance with the Investment Advisory Agreement, the Security Agreement and the Investment Advisor's customary procedures for selecting investments of a type similar to the Collateral Assets. ***The Investment Advisor has undertaken its own investigation in selecting the initial Collateral Assets and has reviewed such information as it deemed appropriate and proper.***

(Emphasis added.) The Offering Circular further states that "[t]he Investment Advisor accepts responsibility for the information provided in 'The Investment Advisor' section."

93.     Instead of undertaking an investigation it "deemed appropriate and proper," TCW failed to undertake the due diligence represented above; otherwise TCW would have observed the escalating EPDs, kickouts, and nonconforming loans it selected for Davis Square VI's collateral portfolio. Assuming that TCW did perform such thorough due diligence, TCW must have seen the problems and chosen to conceal them.

94.     TCW's failure to undertake due diligence is further demonstrated by the poor quality of the RMBS that TCW caused Davis Square VI to purchase as reinvestments during 2007 and 2008. Specifically, of the approximately one dozen RMBS that TCW has caused

Davis Square VI to purchase since the beginning of 2007, all but one has been downgraded to junk, and many have been sold from the CDO's collateral portfolio at a severe loss.

## VI.    Defendants Knowingly Misrepresented The Risks Of Investing In Davis Square VI.

95.    Goldman and TCW knowingly misrepresented the risks of investing in the Notes to LBBW Luxemburg. In the Offering Circular for the Notes, dated March 28, 2006, Defendants represented that "[i]t is a condition of the issuance of the Notes that the . . . Class A-1LT-b Notes . . . and the Class A-2 Notes be issued with a rating of 'Aaa' by [Moody's] and 'AAA' by [S&P]." The Offering Circular explains that these ratings are based upon the assessment of Moody's of "the probability that the Collateral Assets will provide sufficient funds to pay the rated portion of such Notes . . . ." The Offering Circular likewise states that S&P's ratings "address the likelihood of the timely payment of interest and ultimate payment of principal by the Stated Maturity."

96.    In addition to misrepresenting the Notes supposed triple-A ratings, Davis Square VI's marketing materials also stated, with regard to the securities selected for Davis Square VI's collateral portfolio, that "100% must have a rating of at least A3 from Moody's or A- by S&P." Defendants thus represented that they would place only stable, investment grade debt securities in Davis Square VI's collateral portfolio. Contrary to these statements, Defendants knew, but concealed from Moody's, S&P, LBBW Luxemburg, and others, the fact that sharp increases in EPDs and kickouts among the mortgages backing these securities made them undeserving of their investment grade ratings. At present, the Notes have "junk" ratings from both S&P and Moody's, reflecting the delinquencies that have continued to occur in the collateral portfolio.

97.    Goldman knowingly provided a misleading "risk factor" in the Offering Memorandum that stated that the risks associated with Davis Square VI "may" differ substantially from previous CDOs structured by TCW:

> *Relation to Prior Investment Results.* The prior investment results of the Investment Advisor and the services associated with the Investment Advisor or any other entity or person described herein are not indicative of the Issuer's future investment results. ***The nature of, and risks associated with, the Issuer's future investments may differ substantially from those investments and strategies undertaken historically by such persons and entities.*** There can be no assurance that the Issuer's investments will perform as well as the past investments of any such persons or entities.[3]

(Emphasis added.)

98.    The "risk" that there was a general possibility Davis Square VI's investment results "may" differ substantially from Goldman and TCW's past investments must be contrasted with the empirical reality – then existing and known to Defendants – that the same RMBS selected by TCW were then affected by a dramatic rise in EPDs and kickouts.

99.    The Final Offering Circular further states:

> The amount and nature of collateral securing the Securities and the CP Notes has been established to withstand certain assumed deficiencies in payment occasioned by defaults in respect of the Collateral Assets. See "Ratings." ***If any deficiencies exceed such assumed levels, however, payment of the Securities could be adversely affected.***[4]

(Emphasis added.)

100.    At the time Goldman and TCW marketed and sold the Notes to LBBW Luxemburg, Goldman and TCW already were aware that multiple "deficiencies" existed in the RMBS backing Davis Square VI that exceeded "assumed levels." Therefore, the statement that the Notes "could be adversely affected" must be contrasted with the empirical reality – then existing and known to Defendants – that then existing deficiencies in the Davis Square VI collateral already had "adversely affected" the Notes. Goldman and TCW thus knowingly

---

[3] Final Offering Circular, at 46.

[4] Final Offering Circular, at 46-47.

withheld information relevant to LBBW Luxemburg's purchase of the Notes. Had LBBW Luxemburg been aware of this information, it would not have purchased the Notes.

101.   The Davis Square VI Offering Circular states, "To the best of the knowledge and belief of the issuers, the information contained in this offering circular is in accordance with the facts and does not omit anything likely to affect the import of such information." Defendants knew this statement was false when made. The "issuers" referred to in the Offering Circular are "Davis Square Funding VI, Ltd." and "Davis Square Funding VI (Delaware) Corp." These entities were formed by Goldman and its affiliates for the sole purpose of acquiring the collateral portfolio of RMBS and issuing the Notes. Thus, to the extent these special purposes entities had any knowledge or belief, it must be attributed to Goldman. Goldman knew, by March 2006, that the collateral portfolio held by Davis Square VI was severely impaired and plagued by poor underwriting standards and escalating EPDs and kickouts. Accordingly, Goldman (and the "issuers") knew that the Offering Circular had omitted information "likely to affect the import" of the representations therein.

## VII.   Goldman And SocGen Purchased Credit Default Swaps Through Which They Profited On Davis Square VI's Failure.

102.   Goldman purchased billions of dollars of CDS contracts from AIG, allowing Goldman to profit if the mortgage market collapsed. Many of the CDS contracts purchased by Goldman insured the very same RMBS underlying Davis Square VI. Following the mortgage market collapse, Goldman received over $14 billion from AIG.

103.   Even more shockingly, Goldman purchased CDS contracts specifically betting against Davis Square VI through SocGen. SocGen, which independently received $16.5 billion from AIG, purchased CDS at the direction of Goldman. A February 7, 2010 *Wall Street Journal* article explains that Goldman, through SocGen, purchased more insurance on mortgage

securities through AIG. While it remains unclear how much insurance Goldman bought through SocGen, AIG documents show that Goldman was involved in pricing half of SocGen's $18.6 billion in trades with AIG and that AIG executives believed that Goldman was pressuring SocGen to demand collateral payments.

104.     Defendants did not disclose that they were engaged in such activities at the same time they sold the Notes to LBBW Luxemburg, and LBBW Luxemburg would not have purchased the Notes had it known that Goldman was effectively betting, through the CDS contracts, that the Notes would fail.

## COUNT I

### Common Law Fraud

105.     Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

106.     This is a claim for fraud against Goldman and TCW.

107.     Defendants Goldman and TCW made material misrepresentations and incomplete disclosures, and omitted material information, to induce LBBW Luxemburg to invest $37 million in the Davis Square VI Notes. Goldman and TCW are two of the largest financial institutions and investment advisors, respectively, in the world and are global leaders in structured finance products, including CDOs and RMBS. Goldman and TCW specifically induced LBBW Luxemburg to rely upon their greater knowledge and expertise in these areas. Goldman and TCW intended and knew, or recklessly disregarded, that LBBW Luxemburg in fact did rely upon their expertise.

108.     Goldman and TCW knew, or reasonably should have known, that LBBW Luxemburg, a bank, was interested only in extremely conservative, secure and stable investments. Goldman and TCW knew, or recklessly disregarded, that LBBW Luxemburg's

principal investment criterion was principal preservation.   Goldman and TCW affirmatively misrepresented material facts including that:

      a.     Davis Square VI represented a conservative and secure investment;

      b.     Goldman and TCW would select only stable, investment grade debt securities for inclusion in Davis Square VI's collateral portfolio;

      c.     Goldman and TCW would not substitute or reinvest debt securities into Davis Square VI's collateral portfolio that were expected to be downgraded or otherwise perform poorly.

109.    Each and every representation, as Goldman and TCW knew at the time, was false.

110.    Goldman and TCW also failed to disclose material facts to induce LBBW Luxemburg to invest in Davis Square VI.   For example, Goldman and TCW failed to disclose that:

      a.     Through CDS contracts, Goldman and SocGen stood to profit through the failure of Davis Square VI;

      b.     Goldman offloaded risks in unstable securities from its own books to Davis Square VI;

      c.     Goldman intended to and did take investment positions directly contrary to the interests of Davis Sqaure VI.

111.    Goldman and TCW also failed to disclose that because LBBW Luxemburg's investment in Davis Square VI reflected significantly greater risk than LBBW Luxemburg had been apprised, the credit quality implied by the low yield on the Notes did not represent the Notes' actual, severely impaired quality as known to Goldman and TCW.

112.    Goldman and TCW knew, or recklessly disregarded, that LBBW Luxemburg did not have access to facts that were the subject of misleading or incomplete disclosures by Goldman and TCW, and which Goldman and TCW failed to disclose to LBBW Luxemburg.

113.    Goldman and TCW had an affirmative duty to provide full and complete disclosures regarding these matters because of their superior knowledge and expertise, and because Goldman and TCW had made incomplete and misleading partial disclosures.

114.    Goldman and TCW had the duty to disclose information that Goldman and TCW knew, or recklessly disregarded, was important to LBBW Luxemburg regarding Davis Square VI, but which was not available to LBBW Luxemburg.  Goldman and TCW knew or reasonably should have known that LBBW Luxemburg was acting in reliance on mistaken or incorrect information.

115.    LBBW Luxemburg was induced to purchase the Notes in reasonable reliance on the truthfulness, completeness, and accuracy of Goldman and TCW's representations.

116.    LBBW Luxemburg would not have purchased the Notes in the absence of Goldman and TCW's fraudulent disclosures, and the parties should be returned to their original position prior to the fraudulent disclosures.

117.    As a result, Plaintiff should be awarded damages in an amount to be determined at trial but believed to be in excess of $37 million.  Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

## COUNT II

### Negligent Misrepresentation

118.    Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

119.     Goldman and TCW, as one of the largest financial institutions in the world and as one of the largest RMBS and CDO managers in the world, respectively, had far greater knowledge and expertise regarding the Note's collateral at the time LBBW Luxemburg purchased the Notes, and LBBW Luxemburg relied on such knowledge.

120.     Goldman and TCW knew, or reasonably should have known, that LBBW Luxemburg was relying on their expertise, experience, and advice in such sophisticated investment matters.

121.     Goldman and TCW made misleading and incomplete disclosures and omitted material information to induce LBBW Luxemburg to invest in Davis Square VI, as set forth above.

122.     Goldman and TCW also failed to disclose material facts to induce LBBW Luxemburg to invest in Davis Square VI, as set forth above.

123.     Goldman and TCW know, or reasonably should have known, that LBBW Luxemburg did not have access to facts that were the subject of misleading or incomplete disclosures by Goldman and TCW.  Goldman and TCW had an affirmative duty to provide full and complete disclosures regarding these matters because of their superior knowledge and expertise and because they had made incomplete and misleading partial disclosures.

124.     Goldman and TCW had a duty to disclose information they knew or reasonably should have known was material to LBBW Luxemburg regarding Davis Square VI, but which was not available to LBBW Luxemburg.  Goldman and TCW knew or reasonably should have known LBBW Luxemburg was acting in reliance on mistaken or incorrect information.

125.     LBBW Luxemburg was induced to purchase the Notes in reasonable reliance on the truthfulness, completeness, and accuracy of Goldman and TCW's statements.

126.   LBBW Luxemburg would not have purchased the Notes in the absence of Goldman and TCW's misrepresentations and omissions.

127.   Therefore, Plaintiff should be awarded damages in an amount to be determined at trial but believed to be in excess of $37 million.

## COUNT III

### Unjust Enrichment

128.   Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

129.   Goldman and TCW supplied information for the guidance of LBBW Luxemburg in deciding whether to invest in the Notes.   Such information included representations and omissions regarding the quality of Davis Square VI's collateral portfolio as reflected in the Notes' triple-A ratings.   As explained above, Goldman and TCW's representations were false.

130.   LBBW Luxemburg's purchase of the Notes benefited Goldman and TCW in that Goldman and TCW received millions of dollars in fees.   Goldman also received millions of dollars in windfall profits when Davis Square VI collapsed.   Goldman and TCW knew they were receiving these benefits.

131.   Through Goldman and TCW's selection of the collateral portfolio for Davis Square VI, their having charged an excessively high price for the Notes purchased by LBBW Luxemburg and excessively high advisory fees, their having established an excessively low yield to be paid on the Notes purchased by LBBW Luxemburg, their having made adverse substitutions and reinvestments, and their having entered into and profited from CDS contracts, Goldman and TCW have received a monetary benefit to which they were not entitled.

132.   Because Goldman and TCW unjustly received and retained such monetary benefits from the sale of the Notes and their mismanagement of Davis Square VI, they have been

unjustly enriched at LBBW Luxemburg's expense.  As a matter of equity and good conscience, the parties should be returned to their original positions prior to Defendants' misconduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and permanent relief against Defendants as follows:

1.     Awarding compensatory damages in favor of Plaintiff and against Defendants, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

2.     Awarding Plaintiff punitive damages for Defendants' intentional, willful and malicious misconduct; and

3.     Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel and expert fees;

4.     Awarding such additional equitable and/or injunctive relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 4, 2010

MOTLEY RICE LLC

William S. Norton (WN-4551)
J. Brandon Walker
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
843.216.9000
843.216.9450 (fax)

MOTLEY RICE LLC
William H. Narwold (WN-1713)
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT  06103
860.882.1676
860.882.1682 (fax)

STURMAN LLC
Deborah M. Sturman
275 Seventh Avenue, 2nd Floor
New York, NY  10001
212.577.0045
212.577.0054 (fax)

*Attorneys for Plaintiff*