```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
                               :
LANDESBANK BADEN-              :
WÜRTTEMBERG                    :
                               :
              Plaintiff,       :    10 Civ. 7549 (WHP)
                               :
         -against-             :    MEMORANDUM & ORDER
                               :
GOLDMAN, SACHS & CO. and TCW   :
ASSET MANAGEMENT CO.,          :
                               :
              Defendants.      :
                               :
------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/28/11

WILLIAM H. PAULEY III, District Judge:

      This action arises from the devaluation and downgrade of a mortgage backed Credit Default Obligation ("CDO") known as Davis Square Funding VI ("Davis Square"). Plaintiff Landesbank Baden-Württemberg ("Landesbank") sues Goldman Sachs & Co. ("Goldman") and TCW Asset Management Company ("TCW," together, "Defendants") for common law fraud, negligent misrepresentation, and unjust enrichment. Defendants move to dismiss the Complaint in its entirety pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. For the following reasons, Defendants' motion to dismiss is granted.

## BACKGROUND

The following facts are gleaned from the Amended Complaint ("Complaint"), and Plaintiff's factual allegations are accepted as true for this motion.

### I. The Parties

Landesbank is an international commercial bank headquartered in Stuttgart, Germany, with assets of €412 billion and 13,000 employees worldwide. (Amended Complaint, filed November 4, 2010 ("Compl.") ¶ 20.)

Goldman is a global investment banking, securities, and investment management firm headquartered in New York. (Compl. ¶ 21.) TCW is a California corporation that manages collateral for mortgage-backed securities and other asset-backed securities. (Compl. ¶ 22.)

### II. The Davis Square CDO

On March 30, 2006, Goldman underwrote and issued Davis Square, a CDO collateralized by residential mortgage-backed securities. (Compl. ¶¶ 4, 5.) Residential mortgage-backed securities are structured asset-backed securities that are collateralized by thousands of individual residential mortgage loans. (Comp. ¶ 4.) TCW managed the collateral for Davis Square. (Compl. ¶ 22)

Goldman and TCW marketed Davis Square to institutional investors as a $2 billion "High Grade Structured Product CDO" in a private placement pursuant to Securities and Exchange Commission ("SEC") Rule 144A and Regulation S. (Compl. ¶¶ 5, 7.) Goldman and TCW touted the notes' triple-A ratings and represented that the "Strengths of the Transaction"

lay in Davis Square's collateral portfolio of investment grade mortgage-backed securities. (Compl. ¶ 7.) Landesbank purchased two Davis Square notes totaling $37 million in the initial offering. (Compl. ¶¶ 1, 5.)

Before the transaction, Goldman provided Landesbank and other investors with an Offering Circular ("Circular") disclosing details about the risks inherent in Davis Square's mortgage-backed securities portfolio. (Compl. ¶ 4, 7.) In particular, the Circular warned that Davis Square would invest in "subordinate classes" of mortgage-backed securities, which "are more sensitive to risk of loss and writedowns" and would include risky mortgage loans such as "jumbo" and "balloon payment" loans that might experience higher default rates than traditional mortgages. (Declaration of Christopher J. Dunne, dated January 31, 2011 ("Dunne Decl.") Ex. B[1].) Countrywide Financial Corporation ("Countrywide"), New Century Financial Corporation ("New Century"), and Fremont General Corporation ("Fremont") originated approximately 32%, or $648,490,000, of Davis Square's mortgage-loan collateral. (Compl. ¶ 8.) In addition, 6%, or $118,833,000, of the collateral consisted of "[mortgage-backed securities] underwritten by Goldman itself, and backed by whole loans purchased directly from Countrywide New Century, Fremont and other sub-prime mortgage lenders." (Compl. ¶ 9.) Approximately 79% of the residential mortgages undergirding Davis Square were below prime and had an elevated risk of default. (Compl. ¶ 4.) Nevertheless, Moody's and Standard & Poor's rated Davis Square AAA and Aaa, respectively. (Compl. ¶ 5.) The Circular warned investors to "consider and assess for

---

[1] "[I]t is well established that on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court may also rely upon documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." Halebian v. Berv, 644 F.3d 122, 131, n.7 (2d. Cir. 2011).

themselves the likely level of defaults of the collateral assets, as well as the likely level and timing of recoveries on the collateral assets." (Dunne Decl. Ex. B.)

The Circular required Landesbank to represent that it (1) was a sophisticated investor, (2) understood that investing in Davis Square involved the risk of loss of its entire investment, (3) had access to the financial information of the underlying mortgage-backed securities, (4) had evaluated the purchase price of Davis Square with a full understanding of the risks involved, and (5) had consulted with its own experts and made its own investment decisions. In addition, the Circular required Landesbank to acknowledge that neither Goldman nor TCW was "acting as a fiduciary or financial or investment advisor for [Landesbank] . . . [and Landesbank was] not relying . . . upon any advice, counsel or representations . . . of [Defendants] other than in the Circular." (Dunne Decl. Ex. B.)

Further, the issuers, including Goldman, filed detailed disclosures pursuant to SEC Regulation AB concerning the mortgage-backed securities collateral backing Davis Square. (Dunne Decl. Ex. B) These disclosures included descriptions of the offered securities, periodic remittance reports on loan-level default rates, and historical information on the past performance of securities with similar underlying assets. See, e.g., 17 C.F.R. §§ 229.1102, 229.1103, 229.1111, 229.1114. And as collateral manager, TCW represented that it had performed loan-level due diligence, analyzed the collateral, and reviewed "all metrics available for the pool." (Compl. ¶¶ 15, 88-90.)

III. Fraud Claims

The Complaint alleges that prior to offering Davis Square, Goldman learned that many of the underlying mortgages did not conform to the originator's eligibility requirements and were riskier than the Circular disclosed or the triple-A ratings indicated. During 2005 and 2006, Goldman purchased billions of dollars worth of mortgage pools from Countrywide, New Century, and Fremont. In turn, Goldman bundled those mortgages into mortgage-backed securities, which collateralized CDOs and other securities such as Davis Square. (Compl. ¶ 9.) As part of this process, Goldman analyzed the underlying mortgages and obtained detailed loan-level due diligence from Clayton Holdings, Inc. ("Clayton"). (Compl. ¶ 10.) At the time, Clayton was the largest provider of mortgage loan due diligence for investment banks, and Goldman was its largest client. (Compl. ¶¶ 29, 30.)

Specifically, Landesbank alleges that Goldman was aware through its relationship with Clayton that a high percentage of mortgages were delinquent or in default, or did not conform to the originator's stated guidelines. (Compl. ¶ 33.) In 2007, Clayton reported to Goldman that 22% of the loans it reviewed in the first quarter of 2006 were nonconforming and thus labeled as "Reject" ("Clayton Report"). (Compl. ¶ 33.) Clayton also informed Goldman that Countrywide and New Century loans had a significantly higher percentage of "Reject" loans than the industry average. (Comp. ¶ 33.) Nonetheless, Goldman securitized mortgage loan pools with nonconforming loans and over-weighted Davis Square with Countrywide and New Century loans. (Compl. ¶¶ 8, 9, 33.)

Landesbank further alleges that Goldman concealed the true quality of the mortgages from the rating agencies when it obtained the triple-A credit ratings for Davis Square.

(Compl. ¶¶ 78-87.) Goldman then used the fraudulently obtained credit ratings in marketing materials for Davis Square. (Compl. ¶ 9.) Moreover, the Circular assured investors that those ratings "address the likelihood of the timely payment of interest and ultimate payment of principal . . . ." (Compl. ¶ 94.) The Circular also cautioned that "if any deficiencies exceed assumed levels, . . . payment of the Securities could be adversely affected." (Compl. ¶ 98.) As Clayton's largest client, Goldman had the benefit of Clayton's due diligence reports and "knew by the first quarter of 2006 that underwriting standards had fallen sharply." (Compl. ¶ 33.)

Landesbank asserts that had it known at the time of the offering what Goldman knew about the quality of the underlying mortgages, or had it known that TCW did not conduct proper due diligence, it would not have invested in Davis Square. When the housing market collapsed, many of the mortgage-backed securities underlying Davis Square were downgraded from triple-A to junk. (Compl. ¶¶ 49, 58, 61.)

Landesbank alleges that Goldman profited unjustly from Davis Square in two ways. First, Goldman charged an excessively high purchase price and advisory fees for the notes. (Compl. ¶¶ 5, 6.) Second, Goldman bet against Davis Square by purchasing billions of dollars of credit default swaps from AIG, which insured Goldman against the collapse of the mortgage-backed securities collateral it sold to clients like Landesbank. (Compl. ¶¶ 101-103.)

## DISCUSSION

Defendants move to dismiss Landesbank's claims of fraud and negligent misrepresentation because the Complaint fails to (1) identify an actionable misleading statement made by either defendant, (2) state how Landesbank reasonably relied on any statement by

Defendants, (3) plead loss causation, (4) plead Defendants' scienter, and (5) plead a special relationship for negligent misrepresentation. In addition, Defendants argue that Plaintiffs cannot maintain an unjust enrichment claim because a valid contract governs the transaction.

I.  Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To determine plausibility, courts follow a "two pronged approach." Iqbal, 129 S. Ct. at 1950. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (internal punctuation omitted). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 129 S. Ct. at 1950). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949 (citation omitted).

The Federal Rules of Civil Procedure impose more stringent pleading requirements on complaints charging fraud than on those charging other types of misconduct. See Fed. R. Civ. P. Rule 9(b). Under Rule 9(b), claims of fraud must be plead with particularity and "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). Common law fraud claims must be pled with particularity in accord with the requirements set forth in Rule 9(b). See Steinberg v. Sherman, No. 07 Civ. 1001 (WHP), 2008 WL 2156726, at *3 (S.D.N.Y. May 8, 2008); Matsumura v. Benihana Nat'l Corp., 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008).

II. Common Law Fraud

Under New York law, fraud requires a showing of (1) a material misrepresentation of fact, (2) knowledge of its falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559 (2009).

Landesbank alleges that Goldman learned of the poor quality of the mortgages underlying the mortgage-backed securities before the Davis Square offering. More specifically, the Complaint asserts that Goldman knew that Countrywide, New Century, and Fremont had abandoned their publicly stated guidelines and that their mortgages had higher than industry-average default rates. Thus, Landesbank asserts, Goldman knew that the following statements in the offering material were false: (1) Davis Square earned a valid triple-A rating, (2) Davis Square was a "High Grade Structured Product CDO," and (3) the information contained in the Circular was "in accordance with the facts and did not omit anything likely to affect the import of such information."

Under the heightened pleading requirements of Rule 9(b), it is well settled that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically

identify the reports or statements containing this information." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000). An "unsupported general claim of the existence of confidential company . . . reports that revealed [contrary information] is insufficient to survive a motion to dismiss." San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812 (2d Cir.1996). To move past the pleading stage, plaintiff must "specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001); see also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) (dismissing action where "Plaintiff ha[d] not specifically identified any reports or statements or any dates or time frame in which Defendants were put on notice of contradictory information."); Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007) (same).

Thus, the relevant inquiry is whether Landesbank has specifically identified any contemporaneous report or statement showing that Goldman knew in March of 2006 about the toxicity of the mortgages underlying Davis Square. But Landesbank only references the Clayton Report without alleging who drafted it, who prepared it, or who, if anyone, at Goldman reviewed it. See Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993) ("[R]eferences to unreleased or internal information that allegedly contradict[s] [defendants'] public statements" should indicate such matters as "who prepared the projected figures, when they were prepared, how firm the numbers were, or which officers reviewed them."). Landesbank attaches a report titled "All Clayton Trending Reports" to its opposition papers on this motion. Presumably, that report is the Clayton Report because it contains the same information regarding the quality of Goldman's

mortgage pools for the first quarter of 2006. (See Declaration of William S. Norton, dated Mar. 4, 2011, Ex. 3.) Because the Clayton Report is dated 2007, it cannot support a fraud claim for securities sold in March of 2006. The Complaint also fails to allege any connection between the mortgages reviewed in the Clayton Report and those collateralizing Davis Square. See Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) (dismissing fraud claim where plaintiff failed to allege how loans in a damaging report were connected to the securities at issue). Plaintiff's gossamer allegations concerning the Clayton Report do not satisfy the particularity requirements of Rule 9(b).

While other allegations tend to support an inference that Goldman may have had knowledge of the toxic mortgages, they do not satisfy Rule 9(b). Specifically, Landesbank alleges, inter alia, that (1) in 2005 and 2006 Goldman acquired billions of dollars worth of mortgage pools from Countrywide, New Century, and Fremont and conducted extensive due diligence with respect to those acquisitions, revealing higher than normal exception rates, (2) in March of 2007, Goldman reported having created a "highly specialized," "experienced," and "dedicated group," that independently verified the value of Goldman's mortgage inventory, and had "over the last several years led to a significant reduction in the mortgage related unverified cash inventory. . .", and (3) in the first quarter of 2006, Goldman reported becoming "more vigilant on [early payment default] identification and workout. " (Compl. ¶¶ 23-26.) But these allegations do not give defendants notice of the particulars: the "who, what, when, where and how . . ." required to support a fraud claim. Arazie, 2 F.3d at 1465.

Similarly, Landesbank perfunctorily alleges that Goldman and TCW received information contradicting their public statements because they were middlemen in the mortgage

-10-

securitization business, had access to loan-level information unavailable to other investors, and conducted extensive due diligence. Those allegations are also deficient. "Broad reference to raw data" is not sufficient to plead that defendants knowingly made false statements. See Steinberg v. Ericsson LM Telephone Co., No. 07 Civ. 9615 (RPP), 2008 WL 5170640, at *13–14 (S.D.N.Y. Dec. 10, 2008) ("[T]he Complaint identifies none of this adverse information other than stating, generically, that it was contained in various 'internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports' and 'internal non-public reports' provided to Defendants.").

The allegations concerning TCW are similarly sparse and lack particulars. Landesbank alleges that TCW knowingly misrepresented that it had performed loan-level due diligence on the Davis Square collateral. According to the Complaint, TCW represented that it would "review all metrics available for the pool" and would conduct "Collateral Analysis including loan or pool re-underwriting," and would have "Direct Contact with Originators." (Compl. ¶¶ 88-90.) However, the Complaint is bereft of any specifics about TCW's due diligence or how any of its statements were false. See Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (stating that a plaintiff's fraud claim cannot be based on "speculation and conclusory allegations"); see also SmartTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 505, 517 (S.D. Ohio 2000) (dismissing claims based on speculation that had defendant followed accepted auditing standards, it would have discovered accounting violations, without alleging any particular violations).

All that Landesbank can muster against TCW is that it should have uncovered the substantial number of nonconforming loans originated by Countrywide, New Century, and Fremont, given the subsequent revelations about toxic mortgages. These allegations are paradigmatic "fraud by hindsight" and cannot survive a motion to dismiss. See Novak, 216 F.3d at 309; see also Xerion, 474 F. Supp. 2d at 518 (reliance on subsequent market events to suggest that valuations were false when made was improper "fraud by hindsight"); Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. American Exp. Co., 724 F. Supp. 2d 447, 463 (S.D.N.Y. 2010) ("To the extent Plaintiff relies on the fact that the loss reserves proved inadequate, such allegations must be rejected as 'a classic example of fraud by hindsight.'") (citation omitted); Reiger v. Altris Software, Inc., No. 98 Civ. 528 (TW), 1999 WL 540893, at *8 (S.D. Cal. Apr. 30, 1999) (allegations that "information would have been discovered earlier if the auditor had not violated GAAS . . . constitute[s] fraud by hindsight").

The cases cited by Landesbank where courts have declined to dismiss a fraud claim are inapposite or distinguishable. Either the court did not address the particularity of the pleadings or the plaintiff alleged particularized facts supporting a fraud claim. See, e.g., MBIA Ins. Co. v. Residential Funding Co., No. 603552/08, 2009 WL 5178337, at *4 (N.Y. Sup. Ct. 2009) (only examining whether plaintiff's fraud claims were redundant of contract claims); MBIA Ins. Corp. v. Royal Bank of Canada, No. 12238/09, 2010 WL 3294302, at *3, 5 (N.Y. Sup. Ct. Aug. 19, 2010) (denying motion to dismiss where manager and originator of mortgages lied about the credit-worthiness of their portfolio during the market crash); Abu Dhabi Commercial Bank v. Morgan Stanley & Co., 651 F. Supp. 2d 155, 178 (S.D.N.Y. 2009) (sustaining fraud claims against investment bank that issued "high grade" mortgage-backed

securities, after it received a specified confidential report detailing New Century's degraded portfolio). None of these cases relieve a plaintiff of the obligation to plead fraud with particularity. Accordingly, because Landesbank has failed to meet that standard, its claim for common law fraud is dismissed.

III. Negligent Misrepresentation

To state a claim for negligent misrepresentation in connection with a commercial transaction, a plaintiff must plead justifiable reliance. "[T]he law of negligent misrepresentation requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003). In assessing justifiable reliance, the New York Court of Appeals has described a three step inquiry: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." Kimmell v. Schaefer, 89 N.Y.2d 257, 264 (1996). Where a plaintiff fails to allege the existence of a special relationship, or the relationship is only "sparsely pled," the plaintiff must "emphatically allege[] the other two factors enunciated in Kimmell." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 188 (2d Cir. 2004) (internal quotations omitted).

Under New York law, a "[plaintiff] cannot claim it relied on [the defendant's] special expertise [where] it is clear that [the plaintiff] itself had the relevant expertise at issue." Dallas Aerospace, 352 F.3d at 789. For this reason, New York courts generally do not permit

negligent misrepresentation claims based on arm's-length transactions between sophisticated counterparties. Indeed, "as a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it, such as reviewing the files of the other parties." UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney, 733 N.Y.S.2d 385, 386 (1st Dep't 2001); see also Eternity Global, 375 F.3d at 188 (dismissing negligent misrepresentation claim because the transaction involved a "typical arm's length business transaction"); Sebastian Holding, Inc. v. Deutsche Bank AG, No. 603431/08, --- N.Y.S.2d ----, 2010 WL 4452176, at *1 (1st Dep't 2010) (dismissing claims where "[p]laintiff's alleged reliance on defendant's superior knowledge and expertise in connection with its foreign exchange trading account ignores the reality that the parties engaged in arm's-length transactions pursuant to contracts between sophisticated business entities that do not give rise to fiduciary duties").

    Here, Landesbank fails to allege the existence of the requisite special relationship of trust or confidence with Goldman or TCW. First, the Circular expressly disclaimed any special relationship. Additionally, information about the mortgage-backed securities in Davis Square's portfolio—and even the individual loans backing those securities—were available to Landesbank if it examined SEC filings. Moreover, Landesbank represented that it was a sophisticated investor and had adequately researched and accepted the risks associated with its $37 million Davis Square investment. Accordingly, Landesbank's claim for negligent misrepresentation is dismissed.

IV. <u>Unjust Enrichment</u>

It is well settled under New York law that the "existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." <u>Goldman v. Metro. Life Ins. Co.</u>, 5 N.Y.3d 561, 572 (2005) (internal quotations omitted). Because Landesbank alleges that the securities were sold pursuant to a purchase agreement, (Compl. ¶ 5), recovery under a theory of unjust enrichment is precluded. See <u>U.S. E. Telecomms., Inc. v. U.S. W. Commc'ns Servs., Inc.</u>, 38 F.3d 1289, 1296 (2d Cir.1994); <u>Granite Partners, L.P. v. Bear, Stearns & Co.</u>, 17 F. Supp. 2d 275, 312 (S.D.N.Y. 2000) ("The enrichment which was allegedly unjust was simply the payment of a bargained-for sales price for the securities which were in fact delivered to the Funds . . . . The law is clear that the payments made pursuant to the express terms of a contract cannot be recovered via unjust enrichment theory.").

Even assuming there was no purchase agreement, Landesbank fails to state a claim for unjust enrichment. To establish unjust enrichment, a plaintiff must allege "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." <u>Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.</u>, 448 F.3d 573, 586–87 (2d Cir. 2006) (internal quotations omitted). As discussed earlier, the Complaint's generalities regarding due diligence and the Defendants' knowledge of the toxicity of the Davis Square portfolio fail to state a claim for fraud, or other unlawful behavior. Because of that failure, the Complaint does not articulate how Defendants profited at Landesbank's expense or that "equity and good conscience require restitution." See <u>Chrysler Capital Corp. v.</u>

Century Power Corp., 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991) (dismissing unjust enrichment claim where fraud claim was dismissed and determined to be without merit).

## CONCLUSION

For the foregoing reasons, Defendants Goldman Sachs & Co. and TCW Asset Management Co.'s joint motion to dismiss the Complaint is granted. The Clerk of the Court is directed to terminate all pending motions and mark this case closed.

Dated: September 28, 2011
       New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

William S. Norton, Esq.
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
*Counsel for Plaintiff*

Theodore Edelman, Esq.
Sullivan and Cromwell, LLP
125 Broad Street
New York, NY 10004
*Counsel for Defendant Goldman Sachs & Co.*

Mark A. Kirsch, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
*Counsel for Defendant TCW Asset Management Co.*